IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
January 22, 2009 Session

# VINTAGE HEALTH RESOURCES, INC.
v.
# JAMES JOSE R. GUIANGAN

**Appeal from the Circuit Court for Shelby County**
**No. CT-000950-06    D'Army Bailey, Judge**

---

**No. W2008-01288-COA-R3-CV - Filed August 25, 2009**

---

This appeal involves a breach of an employment agreement. The plaintiff company recruits health care workers from the Philippines to come to the United States to work for its clients. The company recruited the defendant nurse by using written recruitment materials. The nurse signed an employment agreement that differed from the recruitment materials in that one of the benefits listed as "free" in the recruitment materials was not free. Approximately one year into the nurse's three-year term of employment, the nurse resigned. When notified of the nurse's intent to resign, the company's management threatened to report the nurse to immigration officials. Despite the threats, the nurse left the employ of the company. The company then filed the instant lawsuit against the nurse, asserting breach of contract. In his answer, the nurse asserted, *inter alia*, that the employment agreement violated public policy and was unenforceable because the company's threats constituted involuntary servitude. Although unconscionability was not pled, the nurse was permitted to assert the defense at trial. The trial was bifurcated, with the issue of damages reserved. After the trial, the trial court held that the company's threats constituted involuntary servitude, and that the employment agreement was unenforceable because it was unconscionable and contrary to public policy. The trial court also, *sua sponte*, enjoined the company in the future from using recruitment materials that differed from the employment agreements and from threatening to report employees to immigration officials. The company appeals. We reverse the holding that the employment agreement is unenforceable because unconscionability was never pled, the employment agreement is not unconscionable, and the agreement is not contrary to public policy. We vacate the injunctive relief as to the recruitment materials and affirm as to the remaining injunctive relief. The cause is remanded for consideration of the plaintiff company's damage claim and the defendant nurse's counterclaims.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part, Reversed in Part, Vacated in Part, and Remanded**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

Elizabeth E. Chance, Memphis, Tennessee, and E. Patrick Lancaster, Olive Branch, Mississippi, for the Plaintiff/Appellant Vintage Heath Resources, Inc.

Maureen T. Holland, Memphis, Tennessee, for the Defendant/Appellee James Jose R. Guiangan

**OPINION**

**FACTS AND PROCEDURAL HISTORY**

Plaintiff/Appellant Vintage Health Resources, Inc. ("Vintage"), located in Germantown, Tennessee, provides contract health care workers, primarily nurses, to clients such as hospitals and nursing homes. In order to provide these services, Vintage recruits health care workers from the Philippines to come to the United States to work. In a typical situation, a Filipino who is interested in working for Vintage signs an employment agreement in which he agrees to immigrate to the United States, undergo the required testing for licensure in the U.S., and thereafter work for Vintage for three years, in a location and for a client designated by Vintage. In return, Vintage agrees to handle the immigration procedures and obtain an employment visa for the employee, transport the employee to the United States, provide room and board, classes and pay to the employee while he is studying for the licensure exam, and pay the employee a competitive wage and benefits during his three-year term of employment. When Vintage contracts with a medical facility for the employee's services, Vintage is paid by the medical facility at a higher rate than the rate paid by Vintage to its employee; Vintage retains the difference to recoup its expenses and as its profit. After the initial three-year term of employment, the employee can either renew his employment agreement with Vintage or work elsewhere. To recruit Filipinos to work for it, Vintage circulates recruitment materials in the Philippines that outline the benefits of working for Vintage.

One of the nurses recruited by Vintage was Defendant/Appellee James Jose R. Guiangan ("Mr. Guiangan"). Mr. Guiangan is a Filipino citizen, educated in the Philippines. In the Philippines, Mr. Guiangan's course work was taught in English, and he is fluent in English. He worked as a nurse in the Philippines for some 12 to 13 years.

In 2004, Mr. Guiangan was employed as a nurse in the Philippines making approximately 5,000 pesos per month; this was the equivalent of approximately $50 to $100 per month in U. S. dollars. He was interested in immigrating to the United States in order to better provide for his

family.[1]  Mr. Guiangan received a flier from Vintage about opportunities to work in the United States; when he inquired, Vintage sent him a recruitment "packet" outlining the benefits of working for Vintage.  The recruitment materials Mr. Guiangan received listed the following benefits: "Free Recruitment, Free Visa Processing,[2]  Free TSE Review, Free Language Exams, Free Airfare, NCLEX Tutoring,[3] Driver's Training, Paid Vacation & Holidays, Free Housing until working, Health Insurance Provided, Life Insurance Provided, Professional Liability Provided, Workers' Compensation, Up to $1,500 Housing Loan, Up to $1,500 Auto Loan."  The recruitment materials did not indicate that recruits would be compensated for time spent preparing for the NCLEX exam.

On March 30, 2004, Mr. Guiangan signed Vintage's "Master Employment Agreement" and "Assignment Policy" (collectively, the "Agreement") at issue in this case.  Under the Agreement, Mr. Guiangan agreed to relocate to the United States, with Vintage paying the cost of transportation and, with minor exceptions, the cost of immigrating to the United States and obtaining a visa.  Once in the United States, the Agreement stated that, for up to eight weeks, housing, transportation, NCLEX tutoring, and driver's training would be provided to Mr. Guiangan "at a reasonable cost and deducted from [his] Pre-NCLEX compensation."  The "Pre-NCLEX" pay, at the rate of $9 per hour, was designed to pay for Mr. Guiangan's expenses while he studied for the NCLEX exam at Vintage's training center in Cleveland, Mississippi.

The Agreement also set out the hourly base and overtime pay that Mr. Guiangan would receive once he passed the NCLEX licensure exam and began working as a nurse. He would receive sick leave, vacation, holidays, and medical and life insurance.  Mr. Guiangan agreed to work for Vintage at a U.S. facility of Vintage's choosing for a period of three years; upon completion of this term of employment, he would receive a $4,000 bonus.  The Agreement provided that, if Mr. Guiangan left employment with Vintage prior to the completion of his term of employment, he would be subject to a non-compete covenant and would be liable to Vintage for its actual and consequential damages.  The Agreement also stated that, if it appeared to Vintage that Mr. Guiangan had accepted employment with Vintage for the sole purpose of obtaining a visa, Vintage may report this to U.S. immigration officials.

During the period of time in which Mr. Guiangan's immigration paperwork was being processed, he communicated regularly with Vintage personnel, by email and otherwise.  He informed the Vintage employees that his wife is a nurse, that his wife has a sister in California, and that he and his wife were in the process of legally adopting his wife's niece and hoped to eventually bring the niece to the United States to live with them.

---

[1]Mr. Guiangan indicated that a number of Filipinos desire to immigrate to places like the United States to improve their earnings.

[2] Before one of Vintage's nurse recruits can enter the United States, Vintage must petition for the recruit to receive an employment based visa.  For the visa to be issued, the recruit must pass an English competency exam and a nursing skills exam.  The immigration process usually takes from fourteen to eighteen months.

[3] Once a recruit enters the United States, he must pass the NCLEX exam, which is the national licensing exam for nurses, before he can begin working as a nurse.

Mr. Guiangan relocated to the United States on June 7, 2004. The next day, he attended a one-day orientation at Vintage's headquarters in Germantown, Tennessee. During the orientation, Mr. Guiangan signed an acknowledgment that the Agreement he had signed in the Philippines on March 30, 2004 governed his employment in the United States with Vintage. He also signed a document entitled "Living Stipend," which provided that during his NCLEX preparation, he would be paid a net stipend of $300 per month.[4] The Living Stipend contemplated a gross stipend of $1,000 per month with a $700 monthly deduction to pay for expenses such as housing, transportation, and driver's training. The remaining $300 was designed to cover Mr. Guiangan's out-of-pocket expenses.

Mr. Guiangan passed the NCLEX exam. He was assigned to work for Vintage at the Tuomey Regional Medical Center in Sumter, South Carolina. Mr. Guiangan's start date under the Agreement was September 7, 2004. During the course of Mr. Guiangan's employment in South Carolina, Vintage was pleased with his job performance and Mr. Guiangan was satisfied with his employment with Vintage.

On September 29, 2005, approximately a year into his three-year term of employment, Mr. Guiangan emailed a letter to Robert Zimmerman ("Mr. Zimmerman"), Vintage's Senior Vice President, stating that he would resign his employment with Vintage.[5] Mr. Guiangan stated in the letter that he was leaving because his wife was pregnant and she wanted to move to California to be with her sister and to enroll in California's Medicare program.

After Vintage received Mr. Guiangan's email, Jerry Turner ("Mr. Turner"), Vintage's Vice President for Operations in South Carolina, scheduled a meeting with Mr. Guiangan. During the meeting, Mr. Guiangan reiterated his reasons for leaving. In response, Mr. Turner warned Mr. Guiangan that, if he left Vintage before the end of his term of employment, Vintage would report him to immigration officials for breaching his employment contract.

---

[4]The Living Stipend provides as follows:

I understand that my "Pre Employment Agreement" with Vintage Health Resources, Inc. (Company) provides me with a gross stipend of $9.00 per hour during the time I spend at Company's Training Center in Cleveland, MS. I further understand that during the time I am at the Training Center I am to use my time learning how to drive an automobile. It is anticipated that I will be at the Training Center for a few weeks.

I acknowledge that the Company will incur expenses for my housing, local transportation, Driver's Training, etc. during the time I am at the Training Center. I agree to a deduction in the amount of $700 per month from my gross stipend to pay for the Company's expenses on my behalf.

My net stipend will be $300.00 per 30 day period and will be paid by Company check. This $300.00 will cover my out of pocket living expenses to include, but not limited to: food, long distant [sic] phone expenses, and various and sundry personal items.

[5]Mr. Guiangan's resignation letter did not include his anticipated date of resignation. In Mr. Zimmerman's October 19, 2005 letter to Mr. Guiangan, however, Mr. Zimmerman stated that Vintage records indicated that Mr. Guiangan's last day of work would be on or about October 31, 2005. There is no evidence in the appellate record to indicate that Mr. Guiangan planned to leave on any day other than October 31, 2005.

-4-

The meeting with Mr. Turner did not change Mr. Guiangan's mind about resigning. Consequently, on October 19, 2005, Mr. Zimmerman sent a letter to Mr. Guiangan outlining to him the ramifications of his decision to breach the employment contract. If Mr. Guiangan left on October 31, 2005, as planned, Mr. Zimmerman said, he would owe Vintage $20,000. The letter included a promissory note in the amount of $20,000 plus 7% interest, and warned Mr. Guiangan that if he did not sign the promissory note, Vintage would be forced to file a civil lawsuit against him. Finally, the letter warned Mr. Guiangan that Vintage would report Mr. Guiangan to the USCIS[6] and seek his deportation, and if that was not successful, Vintage would seek denial of his application for U.S. citizenship.

Despite the threats by Mr. Turner and Mr. Zimmerman, Mr. Guiangan left Vintage in October 2005 as planned, and moved with his wife to California. Vintage never reported Mr. Guiangan to immigration officials.

On February 23, 2006, Vintage filed the instant lawsuit, alleging that Mr. Guiangan breached his employment contract by leaving before the end of his term. Vintage sought damages for the breach. On June 1, 2006, Mr. Guiangan filed his answer and counter complaint. In his answer, Mr. Guiangan denied liability and asserted: (1) failure to state a claim upon which relief can be granted, (2) estoppel because Vintage sought a judgment for "unsubstantiated monies," (3) a setoff for Mr. Guiangan's unpaid October 2005 salary, and (4) the Agreement was contrary to public policy. Mr. Guiangan's counterclaim alleged that Vintage breached the Agreement by failing to pay him his full pre-NCLEX pay, and that Vintage failed to pay him his October 2005 salary, thereby unjustly enriching Vintage.

Meanwhile, during discovery, Vintage submitted interrogatories to Mr. Guiangan. One interrogatory asked Mr. Guiangan to list the elements allegedly lacking from the Agreement, thereby making it an invalid contract. Mr. Guiangan objected to the interrogatory, but without waiving the objection, stated that there was no meeting of the minds and that the Agreement violated a prohibition against involuntary servitude.[7] Vintage also submitted to Mr. Guiangan an interrogatory asking him to list the public policies he claimed were violated. Without waiving his objection, Mr. Guiangan responded that the Agreement was against the public policy against debt bondage.

The trial took place over a four day period in October 2007. At the outset of the trial, the trial court discussed with the attorneys the issues presented, and in particular sought to ascertain the legal theories on which Mr. Guiangan relied in defending against the employment contract. After Mr. Guiangan's attorney referred to the parties' unequal bargaining power, the trial court inquired as to whether Mr. Guiangan was asserting an unconscionability defense. Mr. Guiangan's counsel replied that she was arguing that the contract is invalid because it is against public policy as expressed in the federal and state constitutions and as "a matter of inequites of the circumstances." The trial court inquired further about unconscionability, and then noted that public policy and

---

[6] The "USCIS" is the United States Citizenship and Immigration Services, which was formerly the INS (Immigration and Naturalization Service).

[7] Throughout the record, the terms "involuntary servitude" and "indentured servitude" are used seemingly interchangeably. For the sake of consistency, we will use the term "involuntary servitude."

unconscionability are separate defenses. Mr. Guiangan's counsel responded by stating that she sought to argue both defenses. Asked to provide the trial court with the standards for determining unconscionability, Mr. Guiangan's counsel asked for a short recess to research unconscionability, commenting that the issue had not been briefed.

After some additional discussion, the trial court observed that Mr. Guiangan essentially conceded that, absent the affirmative defenses, the employment agreement was enforceable. In light of this, the trial court told the attorneys that it would bifurcate the proceedings, first hearing proof on Mr. Guiangan's affirmative defenses and then hearing proof on damages if that became necessary. At this point, Vintage objected to proof on unconscionability as a defense because it was never pled and consequently there was no discovery on unconscionability. Despite Vintage's objection, the trial court allowed Mr. Guiangan to present proof on unconscionability as well as public policy.

In his testimony, Mr. Guiangan described his background as a nurse in the Philippines, and his desire to better provide for his family by immigrating to the United States. He said that numerous employment agencies recruited nurses in the Philippines. The Vintage recruitment materials were made an exhibit and Mr. Guiangan noted that they specified that he would receive free housing. Once Mr. Guiangan entered into the employment agreement with Vintage, however, he understood from the provisions of the employment agreement that the cost of housing and transportation would be deducted from his pre-NCLEX pay.

The process of Vintage obtaining Mr. Guiangan's visa to come to the United States took many months. After Mr. Guiangan obtained his visa and was transported to the United States, he attended the Vintage orientation. At the orientation, Mr. Guiangan was given the "Living Stipend" document informing him that, instead of receiving hourly pay, he would be paid an overall stipend, with deductions for expenses such as training and housing; after such expenses were deducted from the overall stipend, he would receive a net $300 per month "living stipend" to pay for personal expenses and food. This arrangement applied during the six-week period in which Mr. Guiangan was studying for the NCLEX exam. Had he been given the information on the "living stipend" arrangement before leaving the Philippines, Mr. Guiangan asserted, he would have had "a second thought" about his decision. The only breach of the employment agreement alleged by Mr. Guiangan is Vintage's change in the pre-NCLEX compensation.

After Mr. Guiangan passed the NCLEX exam and was placed in South Carolina, he understood that, under the terms of his agreement, he was obligated to work for Vintage for a three-year employment term. After working for Vintage for approximately a year, Mr. Guiangan notified Vintage that he intended to resign because his wife was pregnant and wanted to move to California to be with her sister. That was the only reason Mr. Guiangan gave for his decision.

Mr. Guiangan testified about the threat by Jerry Turner that Vintage would report him to U.S. immigration officials, as well as the threatening letter from Robert Zimmerman. Mr. Guiangan said he felt threatened by the letter. Despite the threats, he and his family moved to California and Mr. Guiangan secured employment at a hospital there.

Vintage submitted testimony from a representative of a Vintage competitor, a company that also recruited nurses from outside of the U. S. to come to the United States to work at client medical facilities. He said that the severe shortage of nurses in the U.S. creates a high demand for nurses from overseas. The witness verified that the rates charged by Vintage to client facilities, and the rates paid by Vintage to nurses such as Mr. Guiangan, were in line with industry standards.

Vintage senior vice president Robert Zimmerman testified as well, outlining the Vintage procedures for recruiting health care workers from the Philippines, securing visas for them, transporting them to the United States, providing housing and training for them, and finding employment for them. He testified about the terms of the employment agreement and the benefits provided to Mr. Guiangan.[8] Mr. Zimmerman acknowledged that Mr. Guiangan was told that he would be paid $9 per hour during his pre-NCLEX training, but in fact he was paid a $1,000 per month stipend with deductions for expenses such as housing and training, leaving a net $300 per month "living stipend" for personal expenses. Mr. Zimmerman claimed that the net $300 per month living stipend amounted to more than Mr. Guiangan would have received at the $9 per hour rate.

Mr. Zimmerman acknowledged sending the threatening letter to Mr. Guiangan. Mr. Zimmerman maintained that the statement about contacting immigration officials about Mr. Guiangan's breach of his agreement stemmed from advice from an immigration attorney. He conceded that the deportation threat was not pursuant to advice of counsel and admitted that the threat was a "bad choice of words" and was "wrong" and "a mistake on my part." Mr. Zimmerman acknowledged that, at the time the letter was sent to Mr. Guiangan, Vintage was aware of Mr. Guiangan's continuing efforts to bring his adoptive daughter to the United States. He said that, in the wake of Mr. Guiangan's departure, Vintage did not contact immigration officials.

At the end of the trial, the trial court rendered an oral ruling that the Agreement was unenforceable, and also *sua sponte* issued injunctive relief against Vintage. The trial court's ruling was memorialized in an order entered on March 6, 2008, in which the trial court held as follows:

---

[8]In Mr. Guiangan's case, in addition to the contractual benefits, Vintage gave him interest-free loans to secure housing in South Carolina and to bring his family to the United States.

FINDINGS AND CONCLUSIONS OF LAW

A.      Based upon the entire record, the testimony of the witnesses and the arguments of counsel, including the law argued by counsel for the parties, the Court finds and concludes that the enforcement of the [Agreement], which was signed by [Mr. Guiangan] should be and hereby is refused on the grounds of unconscionability. The Court specifically found and concluded and hereby reaffirms and concludes that the circumstances show that 1) there was substantially unequal bargaining power between the parties; 2) that the [Agreement] was based on initial misrepresentations; 3) that the recruitment packet was so at variance with the [Agreement] that it amounts to a bait and switch;[9] 4) that the terms of compensation set out in the [Agreement] are unreasonably vague and unfair; and 5) that all these factors taken together constituted high handed and oppressive conduct of [Vintage].

* * *

C.      Based upon the testimony and evidence submitted and the entire record, the Court determined that the fundamental fairness would require [Vintage] in the [Agreement] to tell the employee how long they are ordinarily and reasonably expected to be at the Pre-NCLEX training center, and the minimum number of hours per week that they are ordinarily and reasonably expected to accrue for payment of the pre-NCLEX pay.

D.      Based upon the testimony and evidence submitted and the entire record the Court determined that the circumstances under which the [Agreement] developed and was implemented was based upon an unequal bargaining power between the parties.

E.      Based upon the testimony and evidence submitted and the entire record the Court determined that [Vintage's] attempt to force [Mr. Guiangan] to remain in the employ of [Vintage] under the threat of extremely punitive measures, as in deportation and denial of citizenship, based upon the case of *Humphries v. Various Federal UNINS Employees*, 164 F.3d 936 (5th Cir. 1999), constitutes involuntary servitude through the threat of legal coercion.

F.      Even if the attempt to force [Mr. Guiangan] to remain in the employ of [Vintage] under the threat of extremely punitive measures as in deportation and denial of citizenship did not amount to involuntary servitude, it would be violative of the public policy of the State of Tennessee. And that a contract sought to be enforced by such a business – that conducts themselves in this manner with these kinds of threats – would be unenforceable.

Thus, the trial court determined, *inter alia,* that the Agreement was unconscionable, that there was unequal bargaining power between the parties, that Vintage's threats constituted involuntary servitude, and that the threats violated public policy, all of which rendered the Agreement unenforceable. Consequently, the trial court dismissed both Vintage's claim for breach of contract

---

[9] The trial court later entered an order clarifying that its use of the phrase "bait and switch" was only for analytical purposes and was not a separate defense to the Agreement.

and Mr. Guiangan's counterclaims. The order enjoined Vintage from using recruitment packets with terms "contradictory to the actual terms used in any contracts presented to the employees of [Vintage]" and threatening to report employees to immigration officials, or threatening deportation or to deny citizenship solely based on an employee's decision to seek other employment.

Vintage then filed a motion for a new trial or to alter or amend the judgment, and Mr. Guiangan filed a motion to amend his answer to conform to the evidence, seeking to assert defenses not originally pled, including unconscionability. Both motions were denied. Vintage then filed this appeal.

## ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, Vintage raises the following issues for our review:

> 1. Whether the trial court erred by allowing and relying upon defenses that Mr. Guiangan did not raise prior to trial.
> 2. Whether Mr. Guiangan's evidence at trial carried his burden of proof on the unpled defenses.
> 3. Whether the proof at trial on Mr. Guiangan's asserted defense of violation of public policy and involuntary servitude was sufficient to void the employment contract at issue.
> 4. Whether the trial court erred in finding that the employment contract was wholly unenforceable, notwithstanding the principles of contract construction, waiver, and the existence of a severability clause.
> 5. Whether the trial court erred by entering injunctions against Vintage, *sua sponte*.

Because this case was tried by the trial court sitting without a jury, we review the trial court's findings of fact *de novo* upon the record with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *see also Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001) (citations omitted). Questions of law are reviewed *de novo* with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001) (citations omitted).

## ANALYSIS

From our examination of the trial court's order, it appears that the trial court held that Mr. Guiangan's employment agreement with Vintage was unenforceable because (1) it was unconscionable and (2) it violated public policy. The holding of unconscionability appears based on the difference between the provision in the recruitment materials indicating that housing was "free" and the provision in Mr. Guiangan's employment agreement stating that housing was deducted from his pre-NCLEX compensation, as well as vague and unfair terms in the contract and

-9-

the parties' unequal bargaining power.[10] The finding of violation of public policy appears based on the threats of deportation or denial of citizenship, held by the trial court to constitute involuntary servitude under federal law.

### Waiver of Unconscionability as Defense

Vintage argues that unconscionability was never pled by Mr. Guiangan. It contends that unconscionability is an affirmative defense that, under Rules 8.03 and 12.08 of the Tennessee Rules of Civil Procedure, must be pled by the party asserting it; if not, it will be deemed waived. Because Mr. Guiangan never asserted an unconscionability defense prior to trial, Vintage maintains that it was waived and the trial court should not have considered it.

In response, Mr. Guiangan argues that the defense of unconscionability is based on public policy, *see* RESTATEMENT (SECOND) OF CONTRACTS § 208 cmt. a (1981), and therefore it should not be deemed waived because he specifically pled public policy as an affirmative defense. Although he never used the word "unconscionable," Mr. Guiangan asserts, his motion in limine filed prior to trial made it apparent that he was asserting an unconscionability defense. He also argues that, because the trial court has the authority to consider a defense of public policy even if not pled, *see* ***Cummins v. McCoy***, 125 S.W.2d 509, 513 (Tenn. Ct. App. 1938), and unconscionability is a public policy-based defense, ergo the trial court has the authority to consider unconscionability even if the defense is not specifically pled. Alternatively, Mr. Guiangan asserts that Vintage never made an actual objection to his assertion of the defense of unconscionability, and did not request a continuance, and is therefore precluded from raising the issue on appeal.

We begin by discussing the pleading requirements for affirmative defenses. Tennessee Rule of Civil Procedure 8.03 requires that affirmative defenses be asserted in appropriate pleadings. The version of Rule 8.03 in effect at the time Mr. Guiangan filed his answer provided as follows:

> In pleading to a preceding pleading, a party shall set forth affirmatively facts in short and plain terms relied upon to constitute accord and satisfaction, arbitration and award, express assumption of risk, comparative fault (including the identity or description of any other alleged tortfeasors), discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, waiver, and any other matter constituting an avoidance or affirmative defense. When a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court, if justice so requires, shall treat the pleading as if there had been a proper designation.

---

[10]Unequal bargaining power between the parties is a factor to consider when a court examines whether a contract is unconscionable, but is not an independent basis on which to invalidate a contract. *See* RESTATEMENT (SECOND) OF CONTRACTS § 208 cmt. d (1981).

Tenn. R. Civ. P. 8.03 (2006).[11] An affirmative defense is a defense "that wholly or partly avoids the cause of action asserted by the preceding pleading by new allegations that admit part or all of the cause of action, but avoids liability because of a legally sufficient excuse, justification, or other matter negating the alleged breach or wrong." ***Thompson, Breeding, Dunn, Creswell & Sparks v. Bowlin***, 765 S.W.2d 743, 744 (Tenn. Ct. App. 1987) (quoting LAWRENCE A. PIVNICK, TENNESSEE CIRCUIT COURT PRACTICE § 12-4 (2d ed.)). Unconscionability, although not included in the defenses listed in Rule 8.03, is nonetheless an affirmative defense. *See* 61A AM. JUR. 2D *Pleading* § 327 (1999). Therefore, under Rule 8.03, it must be pled. Otherwise, under Rule 12.08, it is deemed to be waived.[12] ***See In re Estate of Baker v. King***, 207 S.W.3d 254, 265 (Tenn. Ct. App. 2006) (citations omitted).

In this case, Mr. Guiangan argues that he effectively pled unconscionability by asserting the defense of public policy in his answer. We disagree. As pointed out by the trial judge at the outset of the trial, "[p]ublic policy and unconscionability concerns, albeit based on similar facts, are distinct issues." ***Bland, ex rel. Coker v. Health Care and Ret. Corp. of Am.***, 927 So. 2d 252, 257 (Fla. Dist. Ct. App. 2006) (citation omitted). The purpose of the pleading requirements in the Tennessee Rules of Civil Procedure is to "provide the parties and the trial court with notice of the claims and defenses involved in the case." ***Rawlings v. John Hancock Mut. Life Ins. Co.***, 78 S.W.3d 291, 300 (Tenn. Ct. App. 2001) (citations omitted). To read a pleading that asserts only violation of public policy as implicitly including unconscionability would be contrary to both the language and purpose of Rule 8.03. Clearly, even Mr. Guiangan's counsel did not interpret the public policy defense to include an unconscionability defense; on two separate occasions, Mr. Guiangan's attorney asked the trial court for a short recess in order to research the elements of unconscionability, noting, "I have not briefed the issue of unconscionability." We must conclude that Mr. Guiangan did not properly assert the affirmative defense of unconscionability in his answer.[13]

Mr. Guiangan asserts that Vintage never made an actual objection at trial to the defense of unconscionability, and did not request a continuance. We interpret this as arguing that Vintage's failure to object at trial precludes it from arguing on appeal that Mr. Guiangan waived the unconscionability defense by failing to plead it.

---

[11]Effective July 1, 2006, Rule 8.03 was amended to include the defenses of statue of repose and worker's compensation immunity. *See* Tenn. R. Civ. P. 8.03 Advisory Commission Comment to 2006 Amendment. The amendment also removed the term "avoidance" from the Rule.

[12] Rule 12.08 provides in pertinent part as follows: "A party waives all defenses and objections which the party does not present either by motion . . ., or, . . . in the party's answer or reply, or any amendments thereto." Tenn. R. Civ. P. 12.08.

[13]Mr. Guiangan also argues that, in his motion in limine, he made it apparent that he was asserting an unconscionability defense even though he did not use the word "unconscionable." This Court may consider only "those facts established by the evidence in the trial court and set forth in the record." Tenn. R. App. P. 13(c). Although the motion is attached to Mr. Guiangan's appellate brief, an attachment to an appellate brief is not a part of the record. *See* ***UT Med. Group, Inc. v. Vogt***, 235 S.W.3d 110, 122 (Tenn. 2007) (citations omitted). We have been unable to locate the motion in limine in the record, and Mr. Guiangan does not cite us to a place in the record where it can be found. Therefore, we do not consider this argument.

This argument is without merit. Although Vintage did not use the words "object" or "objection," when it became clear that the trial court intended to allow Mr. Guiangan to rely on the defense of unconscionability, Vintage's counsel made the following statement:

> [F]irst of all, unconscionability of the contract is not pled. It's not an affirmative defense that had been cited by [Mr. Guiangan]. So we're coming in here today dealing with the issue of unconscionability, and it's never been set up as a defense. There had been virtually to my knowledge, no discovery concerning unconscionability because it's not been raised as an issue.

Although the word "object" is not used, Vintage clearly opposes allowing Mr. Guiangan to assert unconscionability because it was not affirmatively pled. *See Ellison v. Ellison*, No. E2007-01744-COA-R3-CV, 2008 WL 4415768 (Tenn. Ct. App. Sept. 29, 2008) (language not using the word "object" is nonetheless treated as an objection).

Under all of these circumstances, we conclude that Mr. Guiangan waived the defense of unconscionability by failing to plead it.

### Unconscionability of Contract

In the alternative, even if the defense of unconscionability is not deemed waived, Vintage asserts that Mr. Guiangan's employment agreement is not unconscionable. The determination of whether a contract or a contractual provision is unconscionable is a question of law. *Taylor v. Butler*, 142 S.W.3d 277, 284–85 (Tenn. 2004) (citing *Lewis Refrigeration Co. v. Sawyer Fruit, Vegetable & Cold Storage Co.*, 709 F.2d 427, 435 n.12 (6th Cir. 1983)).

Whether a contract is unconscionable is determined based on the circumstances as they existed at the time the parties executed the contract. *See id.* at 285 (citing RESTATEMENT (SECOND) OF CONTRACTS § 208 (1981)). As previously stated by this Court:

> Unconscionability can be procedural or substantive or both. Procedural unconscionability is usually "some impropriety during the process of forming the contract that deprives a party of a meaningful choice." Substantive unconscionability involves whether the terms of the contract are overly harsh or one-sided.

*Baptist Mem'l Hosp. v. Argo Constr. Corp.*, No. W2008-00822-COA-R3-CV, 2009 WL 2245667, at *7 (Tenn. Ct. App. July 29, 2009) (citations and footnotes omitted). An early case capsulized a contract that involves both procedural and substantive unconscionability: "Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445, 449 (D.C. Cir. 1965), *cited in Trinity Indus., Inc. v. McKinnon Bridge Co.*, 77 S.W.3d 159, 170–71 (Tenn. Ct. App. 2001). The Tennessee Supreme Court has described substantive unconscionability as existing when the "inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on the one hand, and no honest and fair

-12-

person would accept them on the other." ***Taylor***, 142 S.W.3d at 285 (quoting ***Haun v. King***, 690 S.W.2d 869, 872 (Tenn. Ct. App. 1984)). "An unconscionable contract is one in which the provisions are so one-sided, in view of all the facts and circumstances, that the contracting party is denied any opportunity for meaningful choice." ***Id.*** (citation omitted).

The trial court's conclusion that the Agreement was unconscionable appears to have been based on the following findings: (1) the pre-NCLEX housing was listed as free in the recruitment packet but listed among the deductions from pre-NCLEX pay in the Agreement; (2) the description of the pre-NCLEX compensation in the Agreement was vague and unfair in that it did not include an estimate of the number of hours Mr. Guiangan could expect to be paid; (3) there was substantially unequal bargaining power between the parties; and (4) Vintage's overall conduct was "high handed and oppressive."[14]

Here, the proof does not support a finding of either procedural or substantive unconscionability. The trial court was obviously troubled by the variance between Vintage's recruitment materials and its employment agreement with respect to whether Mr. Guiangan would have to pay for his housing costs during the six-week period in which he studied for his NCLEX licensure exam. However, the recruitment materials did not say that Mr. Guiangan would be paid *at all* for his time spent preparing for the NCLEX exam. Mr. Guiangan put on no proof that he received less compensation during the pre-NCLEX period than he would have received with the benefits outlined in the recruitment materials.[15] Even with the trial proceedings bifurcated, showing detriment was an element of Mr. Guiangan's substantive proof of his affirmative defense.

Mr. Guiangan also put on no proof that the difference between the pre-NCLEX pay arrangement in the employment agreement and in the Living Stipend document worked to his detriment.[16] Indeed, Mr. Guiangan did not even say that, had he known the information in the Living Stipend document about his pre-NCLEX compensation, he would have made a different decision about coming to work for Vintage. Mr. Guiangan was asked on direct examination: "If you had been given this living stipend information when you were in the Philippines, would that have changed whether or not you signed the master employment agreement?" In response, Mr. Guiangan could only reply that he would have given it "a second thought." The overall record shows that the method

---

[14] The threats of deportation and efforts to have Mr. Guiangan's U.S. citizenship denied occurred long after the contract was executed, after Mr. Guiangan notified Vintage that he intended to resign prior to the end of his three-year term of employment. Therefore, these threats are not relevant to the analysis of whether the contract is unconscionable.

[15] The trial court indicated that Vintage should have estimated for Mr. Guiangan the number of pre-NCLEX hours he would be paid. However, at the time of trial, Mr. Guiangan was fully capable of testifying as to how many hours he *actually* spent in preparation for the exam, but he failed to do so.

[16] The Vintage representative, Mr. Zimmerman, testified that the net to Mr. Guiangan from the Living Stipend was no less than he would have received at $9 per hour. However, the trial court in its oral ruling seemed to discredit this assertion. We defer to the trial court's assessment of Mr. Zimmerman's credibility on this point. Nevertheless, the burden remained on Mr. Guiangan to prove that he received less money under the Living Stipend than he would have received under the pre-NCLEX pay outlined in his employment agreement. Mr. Guiangan failed to do so.

of calculating Mr. Guiangan's compensation during the six weeks in which he was preparing for his NCLEX exam was a minor component of the overall contractual arrangement between Vintage and Mr. Guiangan. Mr. Guiangan simply did not show that any variance in the calculation of the pre-NCLEX compensation made any real difference to him.

The trial court also based its determination of unconscionability on a finding that the parties had substantially unequal bargaining power. Unequal bargaining power alone is an insufficient basis upon which to conclude that a contract is unconscionable. *See* RESTATEMENT (SECOND) OF CONTRACTS § 208 cmt. d (1981). It is, however, a factor. The fact that Vintage is a corporation and Mr. Guiangan is an individual is a consideration, but is not enough in and of itself to find that the parties had substantially unequal bargaining power. In this case, the testimony at trial established that Mr. Guiangan's skills as a nurse were in high demand in the United States, and there were several agencies in the Philippines competing with Vintage to recruit nurses to work in the United States. Moreover, although the evidence indicated that Mr. Guiangan's pay as a nurse in the Philippines was a small percentage of average nurse pay in the United States, there was no evidence regarding the standard of living in the Philippines to put it into context. There was no evidence of special circumstances that compelled Mr. Guiangan to leave the Philippines and immigrate to the U.S. Overall, the evidence does not indicate that, at the time the parties executed the employment agreement, Mr. Guiangan was left without a meaningful choice.

Most importantly, the undisputed proof shows that the terms of Mr. Guiangan's employment agreement with Vintage were far from "one-sided" or "unreasonably harsh" or "oppressive." Indeed, the terms overall were fair and favorable to Mr. Guiangan.[17] Under the Agreement, Mr. Guiangan paid essentially nothing in advance, and Vintage "fronted" all of the expenses. The Agreement provided that Vintage would pay for, among other things, Mr. Guiangan's visa, attorney's fees for processing the immigration paperwork, transportation to the United States, compensation while studying for the licensure exam, and his state licensure fees. Once Mr. Guiangan passed the licensure exam, the Agreement provided that Mr. Guiangan would have a waiting job in the U.S., at which he would earn $17 per hour, and that he would receive raises after six months, after one year, and after two years. Vintage was also required to provide Mr. Guiangan with vacations, holidays, health insurance, and life insurance at no cost to Mr. Guiangan, and if Mr. Guiangan completed the three year term, Vintage agreed to pay him a $4,000 completion bonus. Vintage would recoup its expenses and make its profit by retaining a portion of the compensation paid by Vintage's U.S. client for Mr. Guiangan's services, over a three-year period of time. After that, Mr. Guiangan was free to remain working in the U. S. with no further obligation to Vintage. Overall, this is hardly a contract in which the "inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other." *Taylor*, 142 S.W.3d at 285 (quoting *Haun*, 690 S.W.2d at 872).

---

[17]When Mr. Guiangan decided to resign from his employment with Vintage, the only reason given for his decision was his pregnant wife's desire to live near her sister in California. Nothing in the record indicates that, when Mr. Guiangan entered into the employment agreement or during his employment with Vintage, he perceived the terms as overall unfair or oppressive to him.

-14-

In sum, the record does not support a finding that Mr. Guiangan's employment agreement with Vintage was unconscionable. Therefore, this finding by the trial court must be reversed.

## Public Policy

Vintage argues on appeal that the trial court erred in holding that Mr. Guiangan's employment agreement was unenforceable as violative of public policy. The trial court's holding was based on Vintage's threats to report Mr. Guiangan's breach of his three-year employment contract to U.S. immigration officials, and Vintage's threats to seek deportation and denial of Mr. Guiangan's bid for U.S. citizenship. The trial court found that Vintage's conduct amounted to involuntary servitude through the threat of legal coercion, in violation of federal criminal laws, and was a violation of the public policy of the State of Tennessee.[18]

Mr. Guiangan's employment agreement with Vintage contains the following provision:

> If it appears that the Employee has accepted employment with the Company for the sole purpose of obtaining an immigrant visa, the Company may notify the U.S. Immigration and Naturalization Service that, in their opinion, the visa was obtained with fraudulent intentions. The Company may also notify the U.S. Embassy in Manila, Philippines.

Of course, Mr. Zimmerman's letter to Mr. Guiangan went well beyond any provisions in Mr. Guiangan's contract, stating: "[W]e will report you to [U.S. immigration officials] and seek your deportation and if not successful with that we will seek denial of your citizenship." At trial, Vintage representatives explained that their attorneys recommended that they inform U.S. immigration officials when an employee breached his contract, but they had no explanation or excuse for the threats to seek deportation or denial of citizenship, conceding that such statements were "a mistake" and were "wrong."

The determination of whether a contract is against public policy is a question of law. *Mattox v. Loretto Fin. Servs.*, No. 01A01-9307-CV-00308, 1994 WL 698046, at *2 (Tenn. Ct. App. Dec. 14, 1994) (citing 5 SAMUEL WILLISTON, A TREATISE ON THE LAW OF CONTRACTS § 12:1 (5th ed. 1993)). Generally, parties are free to contract as they wish; courts should carry out the terms bargained for in the contract unless those terms violate public policy. *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 100 (Tenn. 1999) (citations omitted). A contract will not be deemed to violate public

---

[18]Mr. Guiangan's argument as to involuntary servitude, and the trial court's finding in this regard, does not appear to be the basis for a separate request for relief, as with a tort claim. The trial court found no separate liability of Vintage arising out of the threats. Rather, the finding of involuntary servitude was argued only as a basis for the trial court's finding that the employment agreement should be deemed unenforceable as violative of public policy. Moreover, despite Mr. Guiangan's vigorous assertions to the contrary, the record indicates that the threats were unsuccessful, and Mr. Guiangan left Vintage's employment as he originally planned. Specifically, Mr. Zimmerman's threatening letter to Mr. Guiangan refers to Mr. Guiangan planning to leave by October 31, 2005, and there is no evidence in the record of any other planned departure date. The record indicates that Mr. Guiangan left during October 2005.

policy unless it tends to harm the public good or conflict with Tennessee's constitution, laws or judicial decisions. *Spiegel v. Thomas, Mann & Smith, P.C.*, 811 S.W.2d 528, 530 (Tenn. 1991).

To determine whether a contract is void as violative of public policy, we consider "the situation of the parties at the time the contract was made and the purpose of the contract." *Hoyt v. Hoyt*, 372 S.W.2d 300, 303 (Tenn. 1963) (citations omitted). Courts will decline to enforce a contract on the ground of public policy only when the impropriety is clear and inherent in the contract, "not merely collateral." *Mattox*, 1994 WL 698046, at *5; *McCallum v. McIsaac*, 21 S.W.2d 392, 393 (Tenn. 1929). "The principal that contracts in contravention of public policy are not enforceable should be applied with caution." *Home Beneficial Ass'n v. White*, 177 S.W.2d 545, 546 (Tenn. 1944) (quoting *Twin City Pipe Line Co. v. Harding Glass Co.*, 283 U.S. 353, 356, 357 (1931)). This is particularly true where one who, like Mr. Guiangan, "has had the benefit of performance by the other party will be permitted to avoid his own promise." *Id.* (quoting *Twin Pipe Line Co.*, 283 U.S. at 356, 357)). Thus, we focus on the purpose and the terms of Mr. Guiangan's employment agreement.

We first consider the purpose of the contract. If the purpose underlying the agreement contravenes public policy, it will be deemed unenforceable. *See, e.g., Mattox*, 1994 WL 698046, at *6 (purpose of contract was to avoid statutorily required forfeiture of vehicle used to transport stolen property); *Home Beneficial Assn.*, 177 S.W.2d at 546 (contracts with election to public office as consideration are against public interest).

The purpose of Mr. Guiangan's employment agreement with Vintage is to enable him to live and work in the United States; in consideration of Vintage facilitating this, Mr. Guiangan agrees to work for Vintage for a three-year term. Employment for a term certain is, of course, universally recognized and in no way contravenes public policy. As with any other contract, a party who chooses to breach a contract may be called upon to pay damages that result from his breach. The fact that Mr. Guiangan may be required under the employment agreement to pay damages to Vintage if he leaves his employment before the end of the term in no way constitutes involuntary servitude. Vintage did not seek and could not obtain specific performance; it could only obtain money damages. At any rate, this was not the basis of the trial court's finding. Thus, the purpose of Mr. Guiangan's employment agreement does not violate public policy.

We next consider the terms of Mr. Guiangan's employment agreement. Even if the overall purpose of a contract is not improper, a particular term of the contract may violate public policy. *See, e.g., Baugh v. Novak,* No. M2008-02438-COA-R3-CV, 2009 WL 2474714, at *6 (Tenn. Ct. App. Aug. 13, 2009) (contractual limitation on transfer of stock undermined purpose of Tennessee statute or stock transfers); *see also Bio-Medical Applications of Tenn., Inc. v. Chary*, No. W1999-01727-COA-R3-CV, 2000 WL 1634201, at *9 (Tenn. Ct. App. Oct. 13, 2000). As in evaluating the overall purpose of the contract, the violation of public policy must be clear and inherent in the language of the contract. *See Baugh*, 2009 WL 2474714, at *8 (citing *Mattox*, 1994 WL 698046, at *3-5).

Here, the only term conceivably at issue states that Vintage may notify immigration officials if it believes that Mr. Guiangan's visa was procured with fraudulent intentions. However, the public

-16-

policy finding in the trial court below does not appear to be based on this language in the Agreement.[19] There was no evidence suggesting that Mr. Guiangan had any fraudulent intent in engaging Vintage to secure an employment visa for him, and Vintage executives did not seek enforcement of this contractual term. Rather, all of the evidence in the record indicates that Vintage's threats to Mr. Guiangan about contacting immigration officials were part of their misguided efforts to persuade Mr. Guiangan to remain in Vintage's employ, not an attempt to fulfill Vintage's obligations under immigration laws.

Thus, neither the purpose nor any term of Mr. Guiangan's employment agreement is offensive to Tennessee public policy. Rather, Mr. Guiangan's argument and the finding of the trial court below appear to be based on Vintage's bad behavior in trying to pressure Mr. Guiangan into completing his three-year term of employment. However, Tennessee law is clear that, for a contract to be deemed unenforceable as violative of public policy, "the illegality[20] must be inherent, not merely collateral." *McCallum*, 21 S.W.2d at 393. Mr. Guiangan has cited no case in which a contract is deemed violative of public policy because of behavior of a party that occurs *ex post facto*.[21] We must reverse the trial court's holding that Mr. Guiangan's employment agreement is unenforceable as violative of public policy, as the finding is based on neither the purpose nor the terms of the contract.[22]

## Injunctive Relief

Finally, Vintage argues that the trial court erred by *sua sponte* issuing injunctive relief against Vintage. A trial court's decision regarding whether to grant injunctive relief is reviewed under an abuse of discretion standard. *Bd. of Comm'rs of Roane County v. Parker*, 88 S.W.3d 916, 919 (Tenn. Ct. App. 2002). A trial court abuses its discretion when "its decision is not supported

---

[19]Mr. Guiangan did not argue to the trial court below that this provision of the employment agreement violated public policy.

[20]As noted in *Mattox*, the term "illegality" has been supplanted in modern cases by "unenforceability on the grounds of public policy," but the meaning remains the same. *Mattox*, 1994 WL 698046, at *5 n.3.

[21]We express no opinion on other legal theories that might have attached to Vintage's admittedly wrongful threats, such as the doctrine of unclean hands or tortious infliction of emotional distress. Such theories were neither pled nor argued in the trial court below, and were not the basis for the trial court's holding.

[22]Mr. Guiangan argues on appeal that the employment agreement violates public policy because it is contrary to T.C.A. §§ 50-1-102 and 50-2-104, both dealing with misrepresentations regarding wages and other compensation. This argument is based on the variance between the recruitment packet and the Agreement regarding Mr. Guiangan's housing and the variance between the Agreement and the living stipend regarding Mr. Guiangan's pre-NCLEX pay. The trial court's finding on public policy, as reflected in its written order, was based squarely on Vintage's threats, which the trial court found amounted to involuntary servitude. Thus, the statutes cited by Mr. Guiangan are not pertinent to our evaluation of the public policy finding. In addition, Mr. Guiangan also argues that Vintage's conduct relative to the housing and pre-NCLEX compensation constitutes fraud. Mr. Guiangan, however, never pled fraud as an affirmative defense, as required by Tennessee Rule of Civil Procedure 8.03, never raised fraud as a defense during trial, and the motion to amend his answer to include fraud as an affirmative defense was denied by the trial court. Therefore, this defense is waived. *See* Tenn. R. Civ. P. 12.08; Tenn. R. Civ. P. 15.02.

-17-

by the evidence, when it applies an incorrect legal standard, [or] when it reaches a decision which is against logic or reasoning that causes an injustice to the party complaining." ***Owens v. Owens***, 241 S.W.3d 478, 496 (Tenn. Ct. App. 2007) (citing ***Biscan v. Brown***, 160 S.W.3d 462, 468 (Tenn. 2005)).

When determining whether to grant injunctive relief, the trial court should consider such factors as the adequacy of other remedies, the danger that the plaintiff will suffer irreparable harm without the injunction, the benefit to the plaintiff, the harm to the defendant, and the public interest. ***See Zion Hill Baptist Church v. Taylor***, No. M2002-03105-COA-R3-CV, 2004 WL 239760, at *5 (Tenn. Ct. App. Feb. 9, 2004) (citing ***Union Planters' Bank & Trust Co. v. Memphis Hotel Co.***, 139 S.W. 715, 718–19 (Tenn. 1911); ***Butts v. City of S. Fulton***, 565 S.W.2d 879, 882 (Tenn. Ct. App. 1977); ***Henry County v. Summers***, 547 S.W.2d 247, 251 (Tenn. Ct. App. 1976); ***Kaset v. Combs***, 434 S.W.2d 838, 841 (Tenn. Ct. App. 1968); ***Herbert v. W.G. Bush & Co.***, 298 S.W.2d 747 (Tenn. Ct. App. 1956); 42 Am. Jur. 2d *Injunctions* § 14 (2000); Robert Banks, Jr. & June F. Entman, Tennessee Civil Procedure § 4-3(b) (2d ed. 1999)). "A court's equitable power to grant injunctions should be used sparingly, especially when the activity enjoined is not illegal, when the injunction is not requested, and when it is broader than necessary to achieve its purposes." ***Kersey v. Wilson***, No. M2005-02106-COA-R3-CV, 2006 WL 3952899, at *8 (Tenn. Ct. App. Dec. 29, 2006) (citing ***Earls v. Earls***, 42 S.W.3d 877 (Tenn. Ct. App. 2000); ***Terry v. Terry***, No. M1999-01630-COA-R3-CV, 2000 WL 863135 (Tenn. Ct. App. June 29, 2000)).

In this case, the trial court, *sua sponte*, entered two injunctions against Vintage at the conclusion of the trial. The parties were not given an opportunity in advance to submit arguments, either for or against the injunctions.

### *Recruitment Materials*

We consider the first injunction issued by the trial court, in which Vintage was enjoined from "using recruitment packets which terms and representations of free benefits are contradictory to the actual terms used in any contracts presented to the employees of [Vintage]." Vintage argues that this injunction should be reversed because, among other reasons, it is overly broad. Vintage asserts that the language of the injunction prohibits Vintage from ever using the recruitment packet given to Mr. Guiangan, even if it changes its employment agreement to be consistent with the packet, because the language of the injunction precludes Vintage from using recruitment packets that conflict with "any" contract that Vintage has ever used. Vintage also states that the injunction prevents Vintage from ever changing the terms of the employment agreement and using recruitment packets that describe the benefits that Vintage plans to give.

In its findings, the trial court stated that Mr. Guiangan's employment agreement "did not include the 'free' benefits listed in the [recruitment materials], instead and directly contrary to the statements in the [recruitment materials], the . . . Agreement . . . provided that [Mr. Guiangan] would have to pay for many of those benefits." It also noted that, immediately after Mr. Guiangan came to the U.S., he was presented with the "living stipend" document to sign, which changed his pre-NCLEX pay from $9.00 per hour to a "stipend" arrangement in which $700 per month of his overall stipend was deducted for expenses, including housing, leaving a net $300 per month for personal

-18-

expenses. The trial court noted that Mr. Guiangan was not told while he was in the Philippines that his pre-NCLEX compensation would be changed in this manner.

It is helpful at this point to review the sequence of changes with respect to Mr. Guiangan's compensation and benefits during the six-week period in which he was preparing to take the NCLEX exam. The recruitment materials given to Mr. Guiangan listed the following benefits as "free": recruitment, visa processing, TSE review, language exams, airfare, and housing until working. Other benefits were noted in the recruitment packet but were not listed as "free." The recruitment packet did not say that an employee would be paid *any* compensation for time spent preparing to take the NCLEX exam. The Vintage employment agreement was consistent with the recruitment materials except that it stated that Mr. Guiangan would be paid "Pre-NCLEX Pay" at a rate of $9 per hour, and that reasonable housing costs for up to eight weeks would be deducted from his pre-NCLEX compensation. Finally, the day after he arrived in the U.S., Mr. Guiangan was asked to sign the "Living Stipend" document. This stated that he would be paid $9 per hour while preparing for the NCLEX exam, but added that expenses for housing, transportation, and the like would be deducted "in the amount of $700 per month from my gross stipend" and that he would receive a "net stipend" of $300 per month to cover his personal expenses.

Thus, the recruitment packet listed "free housing" during NCLEX training and in fact housing was not free. However, the recruitment packet also did not state that Mr. Guiangan would be paid for his time spent preparing for the NCLEX exam, but in fact he was paid, and the housing costs were deducted from that pay. Mr. Guiangan did not establish at trial that the overall difference between the recruitment packet and the Agreement worked to his detriment.[23] More importantly, Mr. Guiangan acknowledged in his testimony that he understood, from the agreement signed months before he left the Philippines, that housing and transportation would be deducted from his pre-NCLEX pay. Under these circumstances, Mr. Guiangan has not established wrongdoing by Vintage when the parties entered into a contractual relationship.

The trial court was rightly concerned about Vintage presenting Mr. Guiangan with a "Living Stipend" document that appears intended to either alter or "clarify" the terms of the parties' employment agreement. This was given to Mr. Guiangan for his signature after both parties had partially performed and Mr. Guiangan had moved to the U.S. However, once again, Mr. Guiangan presented no evidence that the change or "clarification" in the contractual terms were detrimental to him. Thus, based on the record before us, Mr. Guiangan has demonstrated no harm from Vintage requiring him to execute the Living Stipend document.

The injunctive relief issued by the trial court does not affect Mr. Guiangan. Rather, it appears intended to protect future recruits, and thus to protect the public interest. This is an appropriate consideration. *See Zion Hill Baptist Church*, 2004 WL 239760, at *5 (citations omitted). The

---

[23]It is difficult to see how the two differences, taken together, would work to Mr. Guiangan's detriment. The housing costs were, of course, less than his pre-NCLEX pay, because they were deducted from his pre-NCLEX pay, along with other costs, with a net remaining amount for his personal expenses. Housing was not the only expense deducted from the pre-NCLEX pay. Had Mr. Guiangan received free housing but not pre-NCLEX pay, he would have had to pay out-of-pocket for expenses such as NCLEX tutoring, transportation, and driver's training.

injunctive relief addresses only the recruitment materials, not the Living Stipend. However, the evidence in the record does not establish that Vintage engaged in wrongdoing or that Mr. Guiangan or any other recruit would be harmed by Vintage's use of similar recruitment packets and employment agreements in the future. Thus, we must conclude that the trial court abused its discretion and vacate the injunction.

### *Threats*

The trial court also enjoined Vintage from "threatening to report employees to the INS or a similar immigration agency, or threatening deportation or to deny citizenship solely upon an employee's decision to seek other employment (and not due to any criminal or unlawful conduct on the part of that employee which might ordinarily be reported)." Vintage challenges this injunction by arguing that there is no showing that Mr. Guiangan would have been irreparably harmed in the absence of the injunctive relief. Had it been given the opportunity to argue against the injunction, Vintage claims, it may have been able to allay the trial court's concerns. In addition, Vintage argues that this injunction is overly broad. The visa regulations, Vintage maintains, are designed to avoid having a recruit become a public charge by ensuring that recruits have a job when they arrive in the U.S., so reporting employees to the USCIS when they do not fulfill their contractual obligations serves a legitimate purpose.

We agree with Vintage that there was no showing of irreparable harm to Mr. Guiangan. This injunction is directed at Vintage's conduct towards other employees, and will have no effect on Mr. Guiangan. Again, it appears that the trial court's primary consideration in issuing the injunction was protecting the public interest, which is appropriate. Vintage contends that it was not given an opportunity to address the trial court's concerns about the threats. This contention seems at odds with Vintage's rather sheepish admissions at trial and on appeal that threatening Mr. Guiangan with deportation and denial of his bid for U.S. citizenship was wrongful conduct.

Finally, Vintage argues that reporting employees who are in the U.S. on employment visas to the USCIS when they leave their employment early serves a legitimate purpose and Vintage should be allowed to do so. We agree. However, the injunction does not prohibit Vintage from reporting such employees to the USCIS; rather, it prohibits Vintage from *threatening* to employees that they will be reported to immigration officials.

Because this injunction does not prohibit Vintage from actually reporting employees to immigration officials when they breach their contracts, we cannot say that the trial court abused its discretion in issuing this injunction. Therefore, the injunction is affirmed.

### CONCLUSION

In sum, we find that the affirmative defense of unconscionability was never pled by Mr. Guiangan and was waived. In any event, we reverse the trial court's finding that Mr. Guiangan's employment agreement is unconscionable and that it violates public policy. Thus, we find that Mr. Guiangan's employment agreement is enforceable and reverse the trial court's dismissal of Vintage's claim and Mr. Guiangan's counterclaims. The cause must be remanded for further proceedings in

light of this holding.  The trial court's injunction concerning Vintage's use of recruitment packets is vacated.  The injunction concerning Vintage's threats to employees is affirmed.

The decision of the trial court is affirmed in part, reversed in part, and vacated in part as set forth above, and the cause is remanded for further proceedings consistent with this Opinion.  The costs of this appeal are taxed one-half to Appellant Vintage Health Resources, Inc., and its surety, and one-half to Appellee James Jose R. Guiangan, for which execution may issue if necessary.

 

_____

HOLLY M. KIRBY, JUDGE