IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
November 18, 2020 Session

YOLANDA CARTER v. MAURICE BUTLER

Appeal from the Chancery Court for Shelby County
No. CH-18-0162-2  Jim Kyle, Chancellor
———————————————

No. W2020-00169-COA-R3-CV
———————————————

The parties dispute the meaning of a one-page written agreement. Appellee asserts the agreement entitled her to purchase a piece of real property over a four-and-a-half-year lease term, with her rental payments and a non-refundable down payment going toward the purchase price. In contrast, Appellant asserts that Appellee was entitled to purchase the property after the four-and-a-half-year lease term, with credit for her down payment but not her monthly rental payments. Given the ambiguity of the agreement, we defer to the trial court's interpretation and affirm its holding that Appellee purchased the property by the conclusion of the contract's term.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which KENNY ARMSTRONG, and CARMA DENNIS MCGEE, JJ., joined.

Richard L. Rikard, Germantown, Tennessee, for the appellant, Maurice Butler.

Scottie O. Wilkes, Covington, Tennessee, for the appellee, Yolanda Carter.

OPINION

FACTUAL AND PROCEDURAL HISTORY

This Court previously vacated and remanded the order from the Shelby County Chancery Court ("the trial court") in this case because the trial court failed to enter a sufficiently detailed order in compliance with Tennessee Rule of Civil Procedure 52.01. *See generally **Carter v. Butler***, No. W2019-00175-COA-R3-CV, 2019 WL 4942435 (Tenn. Ct. App. Oct. 8, 2019). We recite much of the background in this case from this Court's prior opinion:

Maurice Butler ["Appellant"] was a licensed real estate agent and owner of two businesses that provided services to disabled individuals, including access to affordable housing. In April 2013, Yolanda Carter ["Appellee"] accompanied her sister to view a property owned by [Appellant]. [Appellee]'s sister was an employee of [Appellant] and was interested in renting one of his properties. [Appellee], her sister, and [Appellant] met at a home located at 3200 Cherrywood Cove in Memphis, Tennessee ["the property"].

*Id.* at *1. Mr. Butler had bought the property during a foreclosure sale in 2008 for $35,000.00 in cash. He later took out a $52,000.00 mortgage on it in order to make repairs, including making it accessible to people with disabilities. He paid that mortgage off in 2015. Prior to the time Appellant met Appellee and her sister at the property, at which point it was vacant, he had been renting it for $1,000.00 per month, but intended to raise the rent to $1,100.00 or $1,200.00 per month after that. However, after viewing the property and discussing the rent, Appellee's sister indicated that she could not afford to rent it. Appellee then inquired about other properties Appellant had. The parties agree that she was not looking for a home to rent, as she was already renting another property.

> [Appellee] also informed [Appellant] that she had a limited budget, as she had no job or credit and intended to file for disability. She further explained that she would be unable to secure a traditional loan. Shortly thereafter, [Appellee] and [Appellant] executed a one page document that he drafted entitled "Lease Purchase Agreement for 3200 Cherrywood Cove Memphis TN, 38128."

*Id.* Throughout this document, Appellee is referred to as "Tenant," except under her signature line, where she is referred to as "Buyer." Appellant is referred to as "Landlord" in the document, except for one time when he is referred to as "Landlord/Sellor."

> In accordance with the agreement, [Appellee] agreed to pay [Appellant] $1,000 per month for four and one-half years, or fifty-four months. The agreement contained a provision stating that it began on April 23, 2013 and would end on October 23, 2017. It further provided that if [Appellee] defaulted, the "security deposit" of $10,000 would be forfeited.

*Id.* (footnote omitted). While the document refers to the $10,000.00 payment as a security deposit, Appellant testified that it should have referred to the $10,000.00 payment as a non-refundable down payment, and Appellee does not dispute this.

> [Appellant] contends that there was another document that contained options for purchase of the property that he prepared and discussed with [Appellee] when the lease agreement was signed; [Appellee] denies this. The second

document was not referenced in the lease agreement, nor was it initialed or signed by either party. The [second] document was entitled "Lease Option for 3200 Cherrywood Cove Memphis 38128." The type-written provisions of the document simply stated: "1) Purchase of $65,000 2) Financing search start 3 months prior to lease expire 3) Sales contract drawn at end of lease to address Cnty [sic] City taxes and attorney fees 4) Sales option extended with buyer completing lease as agreed[.]" The document also contained hand-written notes, some of which are illegible, that [Appellant] described as "doodling."

*Id.* Appellee testified that in March 2016, after she received a lump-sum disability back-payment, she contacted Appellant about paying the balance in full on the property. Appellant apparently responded by letter, writing

that he had reviewed the "lease purchase." He further stated that the agreement provided that the monthly payments would continue until October 23, 2017, and that the parties needed "to follow the agreement." In October 2017, [Appellee] paid what she considered to be the final payment on the property. It is undisputed that [Appellee] made all monthly payments from April 2013 until October 2017. After that time, [the parties] exchanged several text messages disputing the terms of the agreement.

In January 2018, [Appellant] filed a forcible entry and detainer warrant in general sessions court, demanding possession of the property and unpaid rent. [The next month, Appellee] filed a complaint in chancery court seeking specific performance, damages for breach of contract, and a lien lis pendens on the property. She also sought an injunction to prevent [Appellant] from prosecuting his general sessions claim. Subsequently, a consent order was entered transferring the general sessions case to chancery court.

*Id.* at *1–2 (footnotes omitted). A fiat was filed in the trial court on July 13, 2018, ordering the trial court clerk to issue an injunction, as requested by Appellee. A bench trial was then held before the trial court judge on July 17, 2018. The only witnesses were Appellant, Appellee, and Appellee's sister. Appellee testified that she told Appellant that she did not want to get into a long-term financing situation. Rather, she

testified that her understanding of the lease purchase agreement was that the purchase price for the property was $54,000 and that [Appellant] was financing the property. She stated that the $10,000 she paid down was a fee for [Appellant] owner-financing the property. She further testified that once all payments in accordance with the agreement were made, she and [Appellant] were to schedule a closing date, so that the property could be deeded in her name. [Appellee] also testified that a second document [in

- 3 -

addition] to the lease agreement was never discussed. She stated that she was not aware of the second document until her counsel showed it to her, after he received it in response to his discovery requests. She testified that, when she exchanged text messages with [Appellant], he never mentioned that she had other terms to fulfill before she could purchase the property[, though he wanted to discuss reimbursement for property taxes and ongoing rent payments].

*Id.* at *2.

Appellee also testified that she knew at the time she signed the agreement that she would be responsible for paying closing costs. In the text messages between her and Appellant that were entered in evidence at trial, Appellee also stated that she and Appellant had discussed that she would assume the responsibility for property taxes after she finished paying off the house.

[Appellant] testified that he drafted the lease purchase agreement. He indicated that he no longer had a real estate license, but knew how to "write a sales contract" [and would not have written one in the form of the one-page agreement at issue]. He testified that his understanding of the agreement was that [Appellee] was leasing the property from him for $1,000 a month for fifty-four months. He testified that, once [Appellee] had fulfilled the terms of her lease, she had the option to purchase the property for an additional $55,000. He indicated the actual purchase price was $65,000; however, her $10,000 down payment would be applied, leaving a remaining balance of $55,000 for the purchase of the home. He further testified that the terms for the purchase of the property were explained on the second document which he and [Appellee] discussed "line by line" on the day they executed the lease purchase agreement.

At the close of the evidence, the trial court issued its oral ruling. A written order memorializing the court's ruling was entered on August 1, 2018. The trial court found that: (1) the agreement was a "lease purchase agreement," (2) [Appellee] had made all payments required under the agreement, (3) [Appellant] was responsible for all property taxes through the date of the order, (4) [Appellee] was responsible for obtaining an attorney to close on the property, (5) [Appellant] will cooperate with closing on the property, (6) the closing would take place within 45 days from entry of the order, and (7) each party was responsible for his or her own attorney's fees.

*Id.* at *2 (footnote omitted). In its oral findings, the trial court found that Appellee did not "owe any rent from the date of the end of this agreement." However, this was not included in the trial court's written order.

On August 10, 2018, [Appellant] filed a motion to reconsider and his first motion to alter or amend judgment. On August 29, 2018, [Appellant] filed an amended motion to alter or amend judgment. Then on August 30, 2018, [Appellant] filed a second amended motion to alter or amend judgment. Each of [Appellant's] motions to alter or amend along with the motion to reconsider provided that the motions were supported by a memorandum "to be filed hereafter." On September 18, 2018, [Appellee] filed a response to the amended motion along with a memorandum in support thereof.

On September 28, 2018, [Appellant] filed a memorandum in which he argued, among other things, that the trial court correctly found the agreement was a lease purchase but erroneously treated it as a finance agreement. After a hearing, the court denied the motions, finding that: (1) the agreement was a lease purchase agreement, (2) it contained numerous ambiguities, (3) based upon the ambiguous provisions, the contract was construed against the drafting party, (4) [Appellant] had superior knowledge of real estate law, and (5) [Appellee's] testimony and version of the facts was "more credible" than [Appellant's]. [Appellant] timely filed a notice of appeal [and on appeal, both parties acknowledged that there were ambiguities in the agreement].

*Id.* at *1–3.

After this Court vacated and remanded the appeal for the trial court to make additional findings, the trial court entered a revised order of judgment on January 8, 2020. Specifically, the trial court's amended order provides

7. The Parties "agreed [they] would do a lease purchase with an option to buy after [the end of the lease]."
8. On or about April 23, 2013, [Appellee] and [Appellant] entered into a "Lease Purchase Agreement for 3200 Cherrywood Cove Memphis, TN 38128," drafted by [Appellant], wherein [Appellee] is referred to as "Tenant" and [Appellant] is referred to as "Landlord/Sellor."
9. The relevant terms of the "Lease Purchase Agreement" are as follows:

   a. Rent — $1,000.00 per month for 54 months (4.5 years)
   b. Duration — April 23, 2013 to October 23, 2017
   c. Security deposit — $10,000.00
        i. The security deposit should have been referred to as a "non-refundable down payment."
        ii. If [Appellee] defaults, deposit would become damages.
   d. "As-is" condition
   e. Risk of loss — on [Appellee]

- 5 -

f. Acknowledgement that [Appellant] is not a legal accounting firm

10. The purchase price of the property would be roughly $55,000.00, after the credit of the $10,000.00 down payment.

11. In or about March 2016, after being approved for disability and receiving a lump-sum back [] payment, roughly around $60,000.00 in total, [Appellee] contacted [Appellant] about paying the balance of the agreement in full.

12. In a letter dated March 18, 2016, [Appellant] responded to [Appellee] writing, "I reviewed lease purchase and . . . the agreement reflects payments of $1000.00 monthly until 10-23-2017 and we need to follow the agreement."

13. [Appellee] continued to make her monthly payments to [Appellant] during the entirety of their agreement, from April 2013 until October 2017.

    a. [Appellee] was at times late on her payments, sometimes up to three (3) weeks late, but she paid the late penalty, and [Appellant] worked with her.

14. During the entirety of the agreement, [Appellant] continued to pay the taxes for the property.

15. While living in the property, [Appellee] made substantial improvements — scraped the ceilings; installed recessed lighting, cherry hardwood floors, crown molding, wainscoting; updated the fireplace; updated the electrical; and evened out the floors.

    a. [Appellee] paid Mike Nelson Remodeling & Painting a total of $18,833.00, pursuant to an Invoice dated April 16, 2016, for the work performed on the property.

    b. She testified she would not have performed this work on the property in the fourth year of the agreement had she merely been renting the property.

16. [Appellant] knew [Appellee] had the work performed on the property.

17. In October 2017, [Appellee] contacted [Appellant] to inform him that she was making what she believed to be her final monthly payment of the agreement.

    a. [Appellant] did not make any comments about anything [Appellee] needed to do outside of addressing the reimbursement of property taxes and being paid for November and December [of 2017].

(Internal citations omitted).

Based on these facts, the trial court ruled that the contract was a lease purchase agreement, the terms of which Appellee fulfilled, including making all payments (an initial $10,000 payment and then $1,000 per month for fifty-four months), and which must be construed against Appellant, as the drafter. The trial court also reiterated that Appellee's testimony was more credible than Appellant's, and again ordered that (1) Appellant is responsible for all property taxes through the date of the order, (2) Appellee is responsible for obtaining an attorney to close on the property, (3) closing shall take place forty-five

days from the date of the order with Appellant's cooperation (or he shall face contempt), and (4) each party must pay their own attorney's fees. Appellant timely appealed again to this Court.

## ISSUE PRESENTED AND STANDARD OF REVIEW

Appellant raises a single issue in this appeal, which is taken from his brief: "Did the Trial Court Err in Treating the Lease Purchase Agreement as a Finance Agreement?

Under Rule 13(d) of the Tennessee Rules of Civil Procedure, we review the trial court's findings of fact "de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Conclusions of law, however, are not entitled to a presumption of correctness. *Cumberland Bank v. G & S Implement Co.*, 211 S.W.3d 223, 228 (Tenn. Ct. App. 2006). Generally, the interpretation of a written contract is an issue of law. *Colonial Pipeline Co. v. Nashville & E. R.R. Corp.*, 253 S.W.3d 616, 621 (Tenn. Ct. App. 2007).

In this case, however, neither of the parties on appeal appears to dispute that the contract at issue was ambiguous and therefore subject to interpretation via extrinsic evidence.[1] Because the contract at issue is undisputedly ambiguous and the parties provided conflicting evidence of its meaning, its meaning has "'become a question of fact.'" *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 890 (Tenn. 2002) (quoting *Smith v. Seaboard Coast Line R.R. Co.*, 639 F.2d 1235, 1239 (5th Cir. 1981)); *see also Bratton v. Bratton*, 601–02 (Tenn. 2004) (citing *Barker v. Freeland*, 91 Tenn. 112, 18 S.W. 60, 61 (1892) ("[W]here the writing is not plain and unambiguous and is such as to require the aid of parole evidence and the parole evidence is conflicting or may lead to more than one conclusion, the doubtful parts may be submitted to the fact-finder for resolution."); *Forde v. Fisk Univ.*, 661 S.W.2d 883, 886 (Tenn. Ct. App. 1983)) (same). "For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect." *Dunn v. Matrix Exhibits, Inc.*, No. M2003-02725-COA-R3-CV, 2005 WL 2604048, at *2 (Tenn. Ct. App. Oct. 13, 2005) (citations omitted). "The trial court is in the best position to resolve factual issues that hinge on credibility and an appellate court will not re-evaluate a trial court's assessment of a witness's credibility absent clear and convincing evidence to the contrary." *Hutchings v. Jobe, Hastings & Assocs.*, No. M2010-01583-COA-R3-CV, 2011 WL 3566972, at *2 (Tenn. Ct. App. Aug. 12, 2011) (citation omitted).

The following rules of construction apply when a contract is ambiguous:

---

[1] In particular, neither party specifically argues that the trial court should not have considered the parol evidence offered at trial, and both parties rely on their own extrinsic evidence, particularly their own testimony, in their respective briefs.

It is the duty of the court in the construction of contracts to ascertain the intention of the contracting parties, understand what they meant by the contract, and give effect to such understanding and meaning. All other rules of construction are only aids or helps in establishing the intention of the parties and for mutual understanding of the meaning of their contract.

Prior negotiations may be considered to determine the real understanding of the parties concerning the meaning of the terms and provisions of the contract.

Where the language of an agreement is contradictory, obscure or ambiguous, or where its meaning is doubtful so that it is susceptible of two constructions, one of which makes it fair, customary, and such as prudent men would naturally execute, while the other makes it inequitable, unusual, or such as reasonable men would not be likely to enter into, the interpretation which makes a rational and probable agreement must be preferred.

[When a party] drew the contract himself[,] the language used therein must be construed most strongly against him.

*Turner v. Zager*, 50 Tenn. App. 674, 690–91, 363 S.W.2d 512, 519 (1962) (quotation marks and citations omitted). In other words, when a contract is ambiguous the trial court must "determine the intention of the parties not alone from the language of the contract but also from surrounding facts and circumstances." *Nat'l Garage Co. v. George H. McFadden & Bro., Inc.*, 542 S.W.2d 371, 374 (Tenn. Ct. App. 1975) (citations omitted). "Furthermore, when a contractual provision is ambiguous, a court is permitted to use parol evidence, including the contracting parties' conduct and statements regarding the disputed provision, to guide the court in construing and enforcing the contract." *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 612 (Tenn. 2006) (citations omitted). "An ambiguous provision in a contract generally will be construed against the party drafting it." *Id.*

Our high court has emphasized that "[t]he central principle endures, to interpret contracts so as to ascertain and give effect to the intent of the contracting parties." *Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tennessee, Inc.*, 566 S.W.3d 671, 694 (Tenn. 2019) (citations omitted). "In effectuating this principle, our courts have noted that judges 'are entitled to place themselves in the same situation as the parties who made the contract, so as to view the circumstances as they viewed them, and so as to judge of the meaning of the words and of the correct application of the language to the things described.'" *Id.* (citations omitted). In other words, "[c]ourts should not be 'shut out from the same light which the parties enjoyed when the contract was executed.'" *Id.* (citations omitted). We keep these principles in mind in adjudicating this appeal.

**DISCUSSION**
**I.**

As noted above, Appellant raises a single issue in this appeal: whether the trial court erred in treating the parties' contract as a finance agreement, rather than a lease purchase agreement. This issue as designated therefore sets forth a binary choice for this Court: (1) interpret the document as a lease purchase agreement, as argued by Appellant; or (2) interpret the agreement as a finance agreement, as purportedly argued by Appellee and found by the trial court. Indeed, the bulk of Appellant's brief focuses on how the trial court's purported decision to interpret the contract as a finance agreement contradicts Appellant's testimony, the language of the parties' written agreement, and the trial court's own finding that the parties agreed to an option.

Despite the issue as designated focusing solely on the choice between lease purchase and finance agreements, the argument section of Appellant's brief appears to raise an additional argument: that while the contract was *intended* to be a lease purchase agreement, it should be interpreted as nothing more than a simple lease due to missing or vague terms. In other words, we read Appellant's brief as asserting that despite the parties' intention to enter into a lease purchase of some sort, their agreement is too indefinite to be enforced as such.

Rule 27(a) of the Tennessee Rules of Appellate Procedure mandates that the appellant's brief contain, under appropriate headings, "[a] statement of the issues presented for review[.]" Tenn. R. App. P. 27(a)(4); *see also* **Forbess v. Forbess**, 370 S.W.3d 347, 356 (Tenn. Ct. App. 2011) (holding that an appellee is held to the same standard as an appellant when it requests affirmative relief on appeal). Subject to some exceptions not present here,[2] "[r]eview generally will extend only to those issues presented for review." Tenn. R. App. P. 13(b). "This rule arises from our recognition that party control over issue presentation is a defining characteristic of the American legal system." **In re David S.**, 2020 WL 1303733, at *15 (citing **United States v. Burke**, 504 U.S. 229, 246 (1992) (Scalia, J., concurring in judgment)). As a result, an issue is generally waived when it is argued in the body of the brief, but not designated as an issue on appeal. *See, e.g.*, **State v. Freeman**, 402 S.W.3d 643, 653 (Tenn. Ct. App. Oct. 16, 2012) ("Generally, an issue argued in the body of the brief, but not designated as an issue will be considered waived"); **Bunch v. Bunch**, 281 S.W.3d 406, 410 (Tenn. Ct. App. 2008); **Childress v. Union Realty Co.**, 97 S.W.3d 573, 578 (Tenn. Ct. App. 2002).

The Tennessee Supreme Court has opined on the specificity required of the designated issues:

---

[2] These exceptions include "(1) to prevent needless litigation, (2) to prevent injury to the interests of the public, and (3) to prevent prejudice to the judicial process." Tenn. R. App. P. 13(b). Other exceptions that have been recognized by this Court include subject matter jurisdiction, mootness, and statutory standing. **In re David S.**, No. E2019-01190-COA-R3-PT, 2020 WL 1303733, at *15 (Tenn. Ct. App. Mar. 18, 2020).

[A] properly framed issue may be the most important part of an appellate brief. Antonin Scalia & Bryan A. Garner, *Making Your Case: The Art of Persuading Judges* 83 (2008); David E. Sorkin, *Make Issue Statements Work for You*, 83 Ill. B.J. 39, 39 (Jan. 1995).

Rather than searching for hidden questions, appellate courts prefer to know immediately what questions they are supposed to answer. Bryan A. Garner, *Garner on Language and Writing* 115 (2009); Robert L. Stern, *Appellate Practice in the United States* § 10.9, at 263 (2d ed. 1989). Accordingly, "[a]n effectively crafted issue statement will define the question to be considered and begin disposing the court to decide in the client's favor." Judith D. Fischer, *Got Issues? An Empirical Study About Framing Them*, 6 J. Ass'n Legal Writing Directors 1, 25 (2009); *see also* **State v. Williams**, 914 S.W.2d 940, 948 (Tenn. Crim. App. 1995) (stating that "[e]ach issue should . . . relate the conclusion that the party wants the appellate court to reach"); Karl N. Llewellyn, *A Lecture on Appellate Advocacy*, 29 U. Chi. L. Rev. 627, 630 (1962) (stating that "the first thing that comes up is the issue and the first art is the framing of the issue so that if your framing is accepted the case comes out your way").

Appellate review is generally limited to the issues that have been presented for review. Tenn. R. App. P. 13(b); **State v. Bledsoe**, 226 S.W.3d 349, 353 (Tenn. 2007). Accordingly, the Advisory Commission on the Rules of Practice and Procedure has emphasized that briefs should "be oriented toward a statement of the issues presented in a case and the arguments in support thereof." Tenn. R. App. P. 27, advisory comm'n cmt. . . . The issues should be framed as specifically as the nature of the error will permit in order to avoid any potential risk of waiver. **Fahey v. Eldridge**, 46 S.W.3d 138, 143-44 (Tenn. 2001); **State v. Williams**, 914 S.W.2d at 948.

**Hodge v. Craig**, 382 S.W.3d 325, 335 (Tenn. 2012). Thus,

"Parties should refrain from incorporating several separate and distinct errors into a single issue." **Williams**, 914 S.W.2d at 948–49 (finding an issue waived because it was "too broad in scope" and "vague and conclusory in nature"). Instead, "[a] separate issue should be presented for each error raised in the appellate court." **Id.** at 948 (citing **Leeson v. Chernau**, 734 S.W.2d 634, 637 (Tenn. Ct. App. 1987)). The Rules of Appellate Procedure "'do[ ] not contemplate that an appellant may submit one blanket issue as to the correctness of the judgment and thereby open the door to argument upon various issues which might affect the correctness of the judgment.'" **Id.** at 948 n.5 (quoting **Leeson**, 734 S.W.2d at 637).

**Cartwright v. Jackson Capital Partners, Ltd. P'ship**, 478 S.W.3d 596, 614 (Tenn. Ct. App. 2015).

Here, Appellant defined its issue as a binary choice between interpreting the parties' contract as a lease purchase agreement or finance agreement; the issue as designated therefore gives no indication that Appellant is asserting that the parties' contract cannot be enforced as either of these two choices, but a different legal relationship altogether. As such, it certainly did not alert this Court if Appellant was arguing that the contract that he admits was intended to be a lease purchase agreement should be interpreted as a mere lease due to vagueness or missing terms.

In addition to Appellant's failure to designate this argument as an issue, the legal support for this argument is somewhat lacking. Importantly, although Appellant asserts that "several material terms were left to be determined and agreed upon at the conclusion of the lease[,]" Appellant's initial brief cites caselaw for propositions involving only two types of missing terms: a description of the property and the purchase price. *See Parsons v. Hall*, 184 Tenn. 363, 367, 199 S.W.2d 99, 101 (Tenn. 1947) (holding that a contract was too "vague and indefinite" because it did not sufficiently describe the property at issue); *Keltner v. Estate of Simpkins*, No. M2014-02023-COA-R3-CV, 2016 WL 1247704, at *2–3 (Tenn. Ct. App. Mar. 29, 2016) (involving a contract that explicitly stated that a purchase price would be agreed to at a later time).[3]

In this case, there is no dispute that the property is sufficiently described in the one-page contract. Although Appellant disputes that the $10,000 down payment and fifty-four $1,000.00 monthly payments provide a purchase price here, he has cited nothing to persuade us that the trial court was unreasonable in finding that these figures provided the purchase price, particularly given Appellee's credited testimony to exactly that. And the parties' contract contains no express terms indicating that the parties would agree to additional terms in the future—this was more than a mere agreement to agree. As such, these cases provide no support for an analogous argument here. Although Appellant's brief elsewhere asserts that the parties had not yet agreed on certain terms, such as attorney's fees, Appellant has cited no authority to support his argument that the omission of these terms rendered the purchase portion of the contract unenforceable.[4] "It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived." *Sneed v. Bd. of Prof'l Responsibility of Sup. Ct.,* 301 S.W.3d 603, 615 (Tenn. 2010). Given Appellant's failure

---

[3] Appellant cites one additional case that is expressly designated as "Not for Publication" and indicates that it may not be cited except as provided in Tennessee Supreme Court Rule 4.

[4] Appellant attempts to flesh this argument out in his reply brief. Reply briefs are not meant for that purpose. *Cf. Augustin v. Bradley Cty. Sheriff's Office*, 598 S.W.3d 220, 227 (Tenn. Ct. App. 2019), *perm. app. denied* (Tenn. Feb. 19, 2020) (noting that even though appellant made "a better effort to address this argument in his reply brief . . . [r]eply briefs . . . are generally not a vehicle to correct deficiencies in initial briefs."). Thus, Appellant's reply brief certainly cannot remedy his failure to designate this argument as an issue.

to properly designate this argument as an issue and the lack of legal support for the argument, we conclude that this argument is waived and we will not address it further.

## II.

Having determined the proper scope of review, we therefore proceed to address the only issue presented in this appeal: whether the trial court erred in interpreting the parties' agreement not as a lease purchase agreement, but as a finance agreement. Again, due to the ambiguity of the contract and the parties' conflicting interpretation, the trial court's interpretation is a question of fact entitled to a presumption of correctness on appeal. *See Planters Gin*, 78 S.W.3d at 890.

Here, the trial court considered not just the language of the written agreement, but also extrinsic evidence, in deciding what the contract means. This evidence consists of the parties' testimony, Appellee's sister's testimony, and various trial exhibits. Neither party has raised the trial court's consideration of such evidence as an issue on appeal or argues that it violates the parol evidence rule.[5] As such, we will likewise consider this extrinsic evidence to determine whether the evidence preponderates against the trial court's interpretation of the contract.

As explained above, the parties testified to their different understandings of the agreement. Appellee testified that they had agreed that after she paid both the $10,000.00 initial payment and monthly payments of $1,000.00 over four-and-a-half years (amounting to a total of $64,000.00), she would become the owner of the property. She also testified that she had informed Appellant that she did not have good credit or a job, would be applying for disability, and would be unable to secure a traditional loan to purchase the home. Furthermore, Appellee testified that she would not have performed almost $19,000.00 worth of work on the property in the fourth year of the agreement had Appellant advised her that she would owe $55,000.00 more after the four-and-a-half year term of the contract ended. Indeed, Appellant states in his brief, "pursuant to the Agreement and their initial discussions, the expectation was that [Appellee] would be purchasing the property shortly thereafter and it would be her house." However, he testified that he did not consent to the improvements before Appellee made them, though he saw at least some repairs when he visited the house to assess a maintenance issue. Nevertheless, the trial court found that Appellant knew Appellee had this work performed on the property.[6]

---

[5] In particular, neither party specifically argues that the trial court should not have considered the parol evidence offered at trial and both parties rely on their own extrinsic evidence, particularly their own testimony, in their respective briefs.

[6] We acknowledge that "[i]n Tennessee, the general rule is that a tenant who voluntarily makes improvements on leased property is not entitled to reimbursement absent an express provision for reimbursement." *Segneri v. Miller*, No. M2003-01014-COA-R3-CV, 2004 WL 2357996, at *5 (Tenn. Ct. App. Oct. 19, 2004) (citations omitted). Still, as explained above, the parties' conduct can be assessed when interpreting an ambiguous contract. *See Watson*, 195 S.W.3d at 612 (citations omitted). And in this case,

Appellant, on the other hand, testified that while Appellee told him that she had no credit and no job, she had "access to like a retirement account or a lawsuit," and that she "never said" that "she would never be able to get a mortgage." It appears that Appellant's argument is that while he knew that Appellee was not in a position to secure traditional financing as of the time they entered into the contract, they agreed that after some years she would be able to improve her credit and then secure financing to buy the property. He testified that he suggested that period be two years, because "at that time [he] was an agent for those that had . . . major credit challenges; two years generally would be enough (sic) for someone to kind of turn it around." But, according to him, they ultimately agreed on four-and-a-half years because she suggested her credit would need more time to improve. Thus, Appellant's understanding of the contract is that they had agreed that Appellee had the option to purchase the property after she leased it, and the purchase price would be $65,000.00 total, with her nonrefundable $10,000.00 initial payment serving as the down payment, leaving a balance of $55,000.00 that Appellee would be required to finance.

As previously discussed, the trial court resolved these opposing interpretations in favor of Appellee, both by expressly crediting Appellee's testimony and generally interpreting the agreement in the manner testified to by Appellee. Our duty is to determine whether Appellant has met his burden to show that the evidence preponderates against the trial court's interpretation of the contract. To reiterate, "[t]he evidence preponderates against a trial court's finding of fact when it supports another finding of fact with greater convincing effect." *Kephart v. Kephart*, 520 S.W.3d 563, 567 (Tenn. Ct. App. 2016). And the trial court is far better-suited to judge the credibility of testimony than are we. *See Hutchings*, 2011 WL 3566972, at *2.

As an initial matter, we note that it appears that Appellant presents this Court with a false dichotomy—that lease purchase and finance agreements are mutually exclusive. We conclude that Appellant's argument is largely semantic and stems from a misunderstanding of the term "lease purchase agreement." Importantly, "parties are free to contract as they wish; courts should carry out the terms bargained for in the contract unless those terms violate public policy." *Vintage Health Res., Inc. v. Guiangan*, 309 S.W.3d 448, 464–65 (Tenn. Ct. App. 2009). Appellant cites nothing that prohibits the parties from providing for owner-financing as part of a lease purchase agreement. Indeed, Appellant concedes in his brief that lease purchase agreements provide "tenants with an option to purchase the property usually after, but occasionally during, the lease period." Moreover, the definition of this type of agreement contemplates this very arrangement. *See Black's Law Dictionary* 973 (9th ed. 2009) (defining a "lease-purchase agreement" as "[a] rent-to-own purchase plan under which the buyer takes possession of the goods with the first payment and **takes ownership with the final payment**; a lease of property (esp. equipment) by which ownership of the property is transferred to the lessee at the end of the lease term. Such a lease is usu[ally] treated as an installment sale.") (emphasis added); *cf. Strategic*

---

Appellee making such extensive renovations suggests she thought she was buying the property.

- 13 -

***Acquisitions Grp., LLC v. Premier Parking of Tennessee, LLC***, No. E2019-01631-COA-R3-CV, 2020 WL 2595869, at *5 (Tenn. Ct. App. May 22, 2020) ("Because the contract provides no definitions of the relevant terms, we turn to dictionary definitions to inform our interpretation."). Here, there is no dispute that the parties' signed agreement is captioned a lease purchase agreement and that it was intended by the parties to create such an agreement. Given the parties' use of this language, the trial court's finding that the lease purchase agreement contained a finance component wherein the purchase would be completed upon the final "lease payment" does not appear to be a transformation of the contract beyond what is contemplated by a "lease purchase agreement."

Appellant also argues that a lease purchase agreement is "two separate, though related agreements: a lease and an option contract" and that "[b]y treating the document as a finance agreement, the trial court rendered the lease component and its terminology irrelevant and inconsequential; it also disregarded the option." According to Appellant, the trial court's decision rendered the contract's actual terms meaningless. *See* ***S. Cast Stone Co. v. Adams***, No. C.A. 1369, 1990 WL 198905, at *6 (Tenn. Ct. App. Dec. 12, 1990) ("[Courts] must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless."). As best we can discern, Appellant is essentially arguing that in finding that Appellee had purchased the property by meeting her obligations under the signed agreement, i.e., the lease portion of the agreement, the trial court disregarded both the terms of the contract and a necessary option portion of the contract.

We begin with the trial court's alleged "disregard[] [of] the option." Here, despite some imprecise language in the trial court's order, it is apparent that the trial court did not improperly disregard the option; no option was actually made a part of the parties' signed agreement. As Appellant correctly points out in his brief, "courts should refrain from construing leases in accordance with expectations not expressed in the agreement." (quoting ***Writzmann v. Baust***, No. 87-217-II, 1988 WL 116384, at *6 (Tenn. Ct. App. Nov. 2, 1988) (citing ***National Garage Co. v. George H. McFadden & Bro., Inc.***, 542 S.W.2d 371, 373 (Tenn. Ct. App. 1975))). Importantly, the signed contract between the parties does not reference an option or a requirement that additional funds would be necessary to accomplish the goal of the contract, a lease purchase.

It is unclear from Appellant's brief how this argument should be interpreted. For one, Appellant did not designate the trial court's treatment of the disputed second page as an issue for our review. *See* ***Freeman***, 402 S.W.3d at 653. And in his summary of the argument he appears to concede that "the option terms were not made part of the lease purchase agreement." Moreover, he begins both his summary of the argument and argument sections with the statement that "[a]t issue [in this appeal] is the intent of a one-page document titled, 'Lease-Purchase Agreement for [the Subject Property].'" So it appears that Appellant is not arguing that the disputed second page should be considered part and parcel of the parties' agreement.

- 14 -

As such, it seems that Appellant is merely arguing that the trial court erred in failing to credit his extrinsic evidence that an option was contemplated by the parties and that Appellee had failed to fulfill the terms of that option. Appellant indeed testified that his expectations included the disputed second page's terms, i.e., that Appellant would exercise her option to purchase by paying an additional $55,000.00 following fifty-four months of lease payments and complying with other to-be-agreed-upon terms covering things like property taxes and attorney's fees. But Appellee sharply disputed that she had ever seen this document prior to the discovery phase of this litigation. Rather, Appellee asserted that the one-page signed document constituted the entire written agreement of the parties and that when she completed the fifty-fourth payment, she had completed all she was obliged to do to purchase the property (with the exception of paying closing costs). In other words, by completing all of the terms of the contract and requesting ownership of the property be transferred to her, Appellee essentially contended that she exercised her option to purchase. Because no "option" is at all mentioned in the parties' signed agreement, Appellant's efforts to inject the disputed second page's "option" terms into the contract alter the agreement far more than conforming to Appellee's proposed interpretation.

Moreover, the trial court specifically found that Appellee was more credible that Appellant. This is especially important as to this issue, as the parties' testimony concerning whether additional terms were discussed and additional funds would be required to purchase the property were diametrically opposed. As we previously explained, we cannot overturn findings that hinge on credibility in the absence of clear and convincing evidence. *Hutchings*, 2011 WL 3566972, at *2. Appellant has provided no clear and convincing evidence to undermine the trial court's express credibility finding in favor of Appellee. The trial court therefore did not err in disregarding Appellant's extrinsic evidence that more was contemplated by the parties to complete the purchase of the property.

We further conclude that the trial court did not disregard the terms of the parties' written agreement in reaching its decision. Importantly, in evaluating this issue, neither the trial court nor this Court is "required to check common sense at the courthouse door[.]" *Dattel Family Ltd. P'ship v. Wintz*, 250 S.W.3d 883, 892 (Tenn. Ct. App. 2007). To be sure, the contract does contain some hallmarks of a lease, such as often referring to the parties as "landlord" and "tenant." Additionally, the monthly payment on the home is the same as the prior lessee paid and similar to other houses that Appellant owns. Appellant further asserts that his payment of property taxes and major repairs militate against the trial court's ruling. Appellant's argument regarding his continued payment of these expenses during the term of the contract is somewhat less convincing, however, as he was, and is, still the record owner of the property. Ownership would not transfer to Appellee unless and until she made all of the required payments under the lease purchase agreement.

Moreover, the contract has several provisions that are not typical of leases, such as sometimes referring to the parties as a "buyer" and "sell[e]r." The contract also contains a fairly astronomical "security deposit," which both parties testified was intended to be a

down payment. The fifty-four-month term is particularly telling, as it constituted a four-and-a-half-year term, rather than the typical lease term marked by full years. Appellant offered no testimony as to why this particular term was chosen other than to allow Appellee to build her credit. It does, however, amount to a dollar figure inexplicably close to the amount that Appellant himself admitted he was willing to sell the home for.[7] These are not only matters of common sense, but are also evident from the fact that the leases Appellant introduced at trial, which included prior leases for the subject property and also for other properties Appellant rents, contain much smaller security deposits and one-year lease terms.[8] These provisions support Appellee's position that the payments constituted payments toward the purchase of the property, rather than mere rental payments that would require an additional payment of a very similar amount at the conclusion of four-and-a-half years.

Moreover, these disputes simply confirm the trial court's treatment of the contract as ambiguous and the trial court's resort to extrinsic evidence to determine its meaning. This fact is important because Appellant was the undisputed drafter of this contract. Indeed, the evidence provided shows that Appellant was previously a real estate agent with extensive experience in both the rental and sale of real property. In contrast, Appellee had no similar experience or education to guide her in making this contract. As previously discussed, we typically construe ambiguous contracts against their drafters. *See Watson*, 195 S.W.3d at 612. As such, the fact that Appellant was the drafter of this contract supports the trial court's finding that Appellee's interpretation, which is not inconsistent with the language of the contract, should be credited and enforced.

Here, much of the evidence as to the proper interpretation of the contract was based on the parties' diametrically opposed testimony. Again, the trial court credited Appellee's testimony, and our review of the contract indicates that various provisions support her testimony. As such, Appellant has failed to submit clear and convincing evidence to overturn the trial court's credibility finding or its factual findings that are predicated on credibility. *See White*, 395 S.W.3d at 713 (citing *Hughes*, 340 S.W.3d at 360). Considering this, along with the other extrinsic evidence the trial court considered, including the parties' conduct and the facts and circumstances surrounding their agreement, and the fact that Appellant was the drafter of the contract, we must conclude that Appellant has not met his burden on appeal—to demonstrate that the evidence preponderates against the trial court's finding that the ambiguous contract is a lease purchase agreement, the terms of which

---

[7] Of course, according to Appellant he was actually entitled to nearly double that amount, considering both the $64,000.00 in lease and initial payments and the $55,000.00 alleged additional purchase price. Appellant testified that the house had been assessed at the time of trial at approximately $82,000.00. Of course, by the time of trial Appellee had done approximately $19,000.00 in improvements to the property. As such, there is little credible evidence of the value of the property at the time the parties entered into the lease purchase agreement.

[8] We note, however, that those leases also refer to Appellant as "Landlord/Sellor"—but none of them are entitled "Lease/Purchase Agreement."

Appellee fulfilled such that she purchased the property. We therefore affirm in full the trial court's decision to award the subject property to Appellee.[9]

## CONCLUSION

For the foregoing reasons, the judgment of the of the Shelby County Chancery Court is affirmed. This case is remanded to the trial court for entry of judgment reflecting the amount of property taxes Appellee is to pay and to determine a closing date.[10] Costs of this appeal are taxed to Appellant Maurice Butler, for which execution may issue if necessary.

s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE

---

[9] We note that Appellant does not designate as an issue the trial court's decision to award specific performance to Appellee under these circumstances. As previously noted, the only issue designated for review concerns whether the trial court erroneously "treated" the contract as a finance agreement. Indeed, this issue was not even argued in Appellant's brief, as the term "specific performance" is not so much as mentioned in the argument section of Appellant's brief and no argument that could even be characterized as skeletal was developed on the issue of whether specific performance of the contract was appropriate in these circumstances. As such, we will not address the propriety of this relief. *See **Sneed**, 301 S.W.3d at 615 (holding that issues are waived when they are not properly briefed).

[10] As previously discussed, Appellee conceded that it was her responsibility to pay closing costs. She is therefore responsible for those costs when closing occurs.